**MISSOURI PORTLAND CEMENT COMPANY, Plaintiff-Appellant-Appellee,**

v.

**CARGILL, INCORPORATED, Defendant-Appellee-Appellant,**
and
**The First Boston Corporation, Defendant.**

**Nos. 1090, 1091, Dockets 74-1024, 74-1025.**

United States Court of Appeals,
Second Circuit.

Argued May 3, 1974.

Decided June 10, 1974.

Certiorari Denied Oct. 15, 1974.
See 95 S.Ct. 150.

---

1. *Compare* § 2104(a) *with* 26 U.S.C. § 6323(f)(2) dealing with situs of securities for other tax purposes.

· Daniel F. Kolb, New York City (Davis Polk & Wardwell and Charles J. Moxley, Jr., William T. Bickerstaff, Dale L. Matschullat, and Rhea Kemble Neugarten, New York City, of Counsel), for Missouri Portland Cement Co.

Gordon B. Spivack, New York City (Lord, Day & Lord, and John W. Castles 3d, Michael J. Murphy, David H. Marks, and Stephen J. Crimmins, New York City, of counsel), for Cargill, Inc.

Before WATERMAN, FRIENDLY and MULLIGAN, Circuit Judges.

FRIENDLY, Circuit Judge:

This appeal illustrates the growing practice of companies that have become the target of tender offers to seek shelter under § 7 of the Clayton Act, 15 U.S.C. § 18. Drawing Excalibur from a scabbard where it would doubtless have remained sheathed in the face of a friendly offer, the target company typically hopes to obtain a temporary injunction which may frustrate the acquisition since the offering company may well decline the expensive gambit of a trial or, if it persists, the long lapse of time could so change conditions that the offer will fail even if, after a full trial and appeal, it should be determined that no antitrust violation has been shown. Such cases require a balancing of public and private interests of various sorts. Where, as here, the acquisition would be neither horizontal nor vertical, there are "strong reasons for not making the prohibitions of section 7 so extensive as to damage seriously the market for capital assets, or so broad as to interfere materially with mergers that are procompetitive in their facilitation of entry and expansion that would otherwise be subject to serious handicaps." [1] These reasons are especially compelling when the target company fails to show that the alleged antitrust violation would expose it to any readily identifiable harm.

1. Turner, Conglomerate Mergers and Section 7 of the Clayton Act, 78 Harv.L.Rev. 1313, 1318 (1965).

## I.

On December 19, 1973, Cargill, Incorporated (Cargill) announced an offer to purchase all the outstanding shares of common stock of plaintiff Missouri Portland Cement Company (MP).[2] In its offer, Cargill stated that it intended to acquire control of MP and either operate it as a subsidiary or merge it into the parent company. The purchase price was $30 per share in cash; this compared with a closing market price of $24.25 on December 18, 1973.

Two days later, MP began this action in the District Court for the Southern District of New York, seeking to enjoin Cargill from continuing with the tender offer. MP charged that Cargill had violated the securities laws in the course of publicizing its offer and that an acquisition of control by Cargill of MP or a merger of MP into Cargill would violate the antitrust laws. Again running true to the usual form, Cargill responded with accusations that MP had violated the securities laws in its public pronouncements opposing the tender offer and sought injunctive relief on its counterclaim. Judge Stewart held hearings on December 27, 1973, and on five days in early January 1974. These led to an order dated January 7, 1974, which, without any accompanying findings of fact or conclusions of law, enjoined Cargill from proceeding with the tender offer during the pendency of the action and placed both companies under certain other restraints. By this time Cargill had acquired 271,000 shares of MP, or approximately 19% of the total, at a cost of roughly $8,130,000.00. A panel of this court ordered an expedited appeal, with briefs to be filed one week after entry of the district court's findings of fact and conclusions of law and with argument to be heard in the following week.

On April 15, 1974, the district court entered its opinion and amended order. The court held that MP had raised "substantial and difficult antitrust questions" which merited further investigation. Finding that the balance of equities was in MP's favor, the court held that MP was entitled to preliminary relief on the antitrust claim. However, it rejected MP's claims that Cargill had violated the securities laws. On the counterclaim, it upheld one of Cargill's securities law claims but denied the rest. The court temporarily enjoined Cargill from proceeding with the tender offer or voting its stock and dealt with MP's violation of the securities laws in a manner recounted in the final section of this opinion. As both sides recognize, the critical determination was the court's finding of a probable antitrust violation, to which we now turn.

## II.

There is not much controversy over the basic facts. We shall limit ourselves to the highlights, referring to Judge Stewart's as yet unreported opinion for amplification.

MP, a publicly held corporation whose stock is listed on the New York Stock Exchange, manufactures portland cement at three riverfront plants. One is located at St. Louis, Missouri, on the Mississippi River; another is at Independence, Missouri, on the Missouri River; and the third is at Joppa, Illinois, on the Ohio River near its confluence with the Mississippi. MP sells the cement produced at these plants through an eleven-state area. Several dozen competitors, including five with plants in Missouri on the Mississippi River, sell in various parts of this area, shipping much of their cement through distribution terminals located along the three great river systems. MP's production capacity is 10,000,000 barrels a year[3]—this being some 2% of

2. There were approximately 1,440,000 shares of MP outstanding on December 19, 1973.

3. The current expansion of MP's Joppa plant will raise the company's capacity to 14,000,000 barrels. Apparently because the modern Joppa facility can accommodate a new kiln without wholesale alterations throughout the plant, the company will be able to increase annual capacity by about 4,000,000 barrels at the relatively modest cost of approximately $2.87 per barrel of annual capacity.

the national capacity and 8% of the capacity within the eleven states MP serves. It is the country's twentieth largest cement producer; eight of the ten largest producers compete in part of MP's sales territory.

The district court focused its attention not on the eleven-state area but on four particular metropolitan markets within that area—St. Louis and Kansas City, Missouri; Memphis, Tennessee; and Omaha, Nebraska. Figures supplied by MP [4] showed the characteristics of these markets to be as follows:

*St. Louis, Missouri Metropolitan Marketing Area*

| | |
|---|---|
| Missouri Portland Cement | 28% |
| River Cement | 24 |
| Alpha Cement | 20 |
| Universal Atlas Cement | 18 |
| Dundee Cement | 10 |

*Kansas City, Missouri Metropolitan Marketing Area*

| | |
|---|---|
| Missouri Portland Cement | 30% |
| Lone Star Cement | 25 |
| Ash Grove Cement | 22 |
| Universal Atlas Cement | 12 |
| Monarch Cement | 5 |
| General Portland Cement | 4 |
| Dewey Cement | 2 |

*Memphis, Tennessee Metropolitan Marketing Area*

| | |
|---|---|
| Missouri Portland Cement | 30% |
| Marquette Cement | 27 |
| River Cement | 21 |

| | |
|---|---|
| Arkansas Cement | 10 |
| Others | 12 |

*Omaha, Nebraska Metropolitan Marketing Area*

| | |
|---|---|
| Ash Grove Cement | 62% |
| Missouri Portland Cement | 21 |
| Lone Start Cement | 10 |
| Ideal Cement | 5 |
| Others | 2 |

The record contains no figures to indicate the proportion of MP's sales represented by these four marketing areas; however, MP's figures show that in the company's other major metropolitan markets, Chicago, Louisville and Nashville, it has 9%, 10% and 15% of the market, respectively. Those shares make MP the third leading cement supplier in Louisville and Nashville, and the seventh in Chicago.[5]

Cargill is a huge privately held company with its headquarters in Minneapolis, Minnesota. It has been engaged in grain trading for over a century. Since 1932 it has operated river barges which carry bulk commodities and tow boats which push the barges. It has expanded into a variety of other bulk commodity businesses—vegetable oil processing, animal feeds, sugar trading, ores and metals, fertilizers, ocean shipping, flour milling, corn wet milling, the manufacture of industrial chemicals, poultry products and salt mining. Cargill's policy is to derive profits by selling a large volume at low margin.[6]

Traditionally, cement capacity has been measured in barrels although the industry is in the process of converting to the use of tons. One ton of cement is equal to about 532 barrels. We shall refer to capacity in barrels throughout since the parties used that scale in most of the proceedings in this case.

4. MP's market share figures have been a source of some controversy here. They were provided by Richard J. Whyte, MP's Vice President of Sales, who stated in an affidavit that he derived the figures "from my 15 years experience in the marketing of cement as well as my knowledge of competitive factors in these metropolitan area markets." His affidavit gave no indication how precise the figures purported to be or what boundaries he had used for each metropolitan marketing area. Cargill complains that Whyte's figures give no time period for the alleged market shares, and that they fail to take into account the production capacity of plants near each geographical submarket which could readily increase their shipments to the market. *Cf.* United States v. General Dynamics Corp., 415 U.S. 486, 498–504, 94 S.Ct. 1186, 1194–1197, 39 L.Ed.2d 530 (1974) (past production statistics not necessarily the best index of ability to compete in the future).

5. MP has river terminals at Decatur, Alabama; Nashville, Tennessee; Owensboro, Kentucky; Louisville, Kentucky; Peoria, Illinois; and Chicago, Illinois, in addition to those at Memphis and Omaha.

6. Cargill's net income for fiscal 1973 was $107,800,000 on sales of $5,300,000,000. Over the last five years, its high volume-low margin

In August 1972, Cargill's Salt Department established the Salt Expansion and Diversification Group (Salt Group) to investigate expansion opportunities for the company. The Salt Group reported to the previously established Long Range Planning Committee of Cargill's board of directors, which was responsible for aiding the chief executive in framing recommendations for the board. After investigating a number of other industries, the Salt Group in the fall of 1972 determined that cement was a particularly promising prospect for Cargill and commissioned an extensive study of the industry. Stuart Leisz, a member of the Salt Group, was assigned to supervise the study. He retained a former cement company president as a consultant and undertook to explore the possible avenues of entry for Cargill into the cement business. After assembling financial and other data on every cement company in the country, Leisz on March 26, 1973, submitted a comprehensive report to the Salt Group recommending that Cargill acquire a cement plant producing between 1½ and 3 million barrels per year. He specifically advised against entering the industry as a new producer for four reasons: (1) the cost of plant construction was prohibitively high—estimated at $10–12 per barrel of annual capacity; (2) Cargill's "limited knowledge of cement production and the basic major differences between our Salt Department and the cement industry" would render a "trial and error start-up" too risky; (3) the delay that would be required for construction and for forming a new organization would be too long—three to four years by Leisz' estimate; and (4) the company might encounter a shortage of qualified production personnel to operate a new plant.

During the summer of 1973, Leisz continued his study of the industry, contacting various cement companies in order to determine what plants might be available for purchase. In late September, the Salt Group rendered a comprehensive report to the Long Range Planning Committee based on Leisz' findings. The report advised that the most promising method of entry would be to acquire an established production unit by purchase or tender offer; it estimated that production facilities could thus be acquired at a cost of approximately $3–4 per annual barrel capacity. The report suggested that if the company chose the purchase route, either Valley Cement in Mississippi or Coplay Cement in Pennsylvania would provide Cargill "a good entrance into the cement business." Among five possible tender offer candidates, MP was the clear first choice.[7] The report termed entry by construction a "low priority option" and recited several of the same considerations that had led Leisz to recommend against that course.

The Long Range Planning Committee concluded that acquiring MP was "the number one priority," and it approved proceeding with acquisition plans if 51% of MP's stock could be acquired at a reasonable price.[8] The committee discarded "out of hand" the possibility of entering the industry by construction, and the proposal to buy Valley, Coplay or another small cement company "wasn't taken seriously," as Cargill's chief executive testified.[9]

In October 1973 Cargill contacted MP and was informed that the management had no interest in selling. Cargill then approached the United States Steel Corporation whose subsidiary, Universal Atlas, is one of the largest cement com-

approach has produced net profits of 1.3% of sales. The district court's opinion contains a more detailed account of Cargill's development and diversification programs.

7. Cargill's Finance Department did a parallel study of possible tender offer candidates in the cement industry and concluded, as did the Salt Department, that MP was the best prospect.

8. The committee also determined to look into the possibility of purchasing the Amcord Cement Company.

9. Erwin Kelm, Cargill's chief executive, noted that upon investigation both Valley and Coplay were found to be high overhead operations, without adequate transportation facilities.

panies in the business, and Dundee Cement Company, owned by Holderbank Financiere Glaris, a Swiss holding company, neither of which was interested in selling. Amcord Cement Company was rejected because the price was too high and because the owners would sell the cement operations only as part of a package with several money-losing non-cement companies. The Mississippi River Corporation, owner of River Cement, demanded a price of $65,000,000, which Cargill considered prohibitive for that company's 6,000,000 barrel capacity. Cargill's board of directors thereupon directed that the tender offer be made for all the outstanding shares of MP stock.

### III.

Preliminarily, we note that the issue of relevant geographical markets is not seriously contested at this juncture.[10] We therefore accept, for the purposes of

this appeal, the district court's ruling that the relevant "section[s] of the country" in which competition is allegedly being foreclosed, 15 U.S.C. § 18, are the four metropolitan markets described above.

Before proceeding further it is well to emphasize that we are not dealing here with the types of merger that have been the historic concerns of the antitrust laws. The case differs totally from the horizontal merger, illustrated by United States v. Philadelphia National Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), where two direct competitors, the second and third largest banks in Philadelphia, proposed to merge. It differs likewise from the vertical merger which, as was said in Brown Shoe Co. v. United States, *supra* 370 U.S. at 324, "by its very nature, for at least a time, denies to competitors of the supplier the opportunity to compete for

10. Cargill argued below that the smallest proper geographical market in this case is the eleven-state area in which MP sells cement. For the purposes of this appeal, however, Cargill assumed the correctness of the district court's geographic submarket determinations, although it challenged the validity of MP's market share figures, see fn. 4, *supra*.

In support of its claim that the metropolitan areas are the relevant markets, MP cites United States Steel Corp. v. FTC, 426 F.2d 592, 596 (6 Cir. 1970), followed in Mississippi River Corp. v. FTC, 454 F.2d 1083, 1090 (8 Cir. 1972). In the *U.S. Steel* case, the court approved the FTC's finding that the proper geographic market for *ready-mixed concrete* was Metropolitan, while the proper market for *portland cement* was regional (including an area extending from Maryland to New Hampshire).

At the trial on the merits, the district court should give careful consideration to additional economic factors in determining whether metropolitan areas are realistic geographical markets for portland cement. For example, the sales range from each terminal may be limited to roughly 200 miles, as the court below found, but a producer can substantially expand the sales range from a single plant by installing terminals in more distant markets, as a number of companies such as Atlantic, Dundee and Huron have done. Since installing terminals is relatively cheap, the barriers to entry into a given metropolitan submarket may be so low for any regional producer that

it is unrealistic to consider each metropolitan area as an independent market.

Also, even accepting the district court's conclusion that metropolitan areas are the proper geographical markets, we do not find it at all clear how Cargill's acquisition of MP could have an adverse competitive effect in the Omaha market. There Ash Grove Cement, with a large plant at Louisville, Nebraska, on the Platte River, has acquired 62% of the market as against the 21% obtained by MP through barging cement from its plant at Independence, Missouri, 2% by Ideal Cement which has a plant in South Central Nebraska, and 10% by Lone Star Cement, the country's second largest cement producer. So far as appears from the record, any improvement of MP's position seems as likely to be at the expense of Ash Grove as of Lone Star or Ideal; the effect of the acquisition on the Omaha market may therefore be affirmatively pro-competitive, *cf.* Brown Shoe v. United States, 370 U.S. 294, 319, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). See Note, Toehold Acquisitions and the Potential Competition Doctrine, 40 U.Chi.L.Rev. 156, 179 (1972) ("the second largest firm in a very concentrated market might be available as a toehold [and therefore legal acquisition] when the largest firm has 60 percent of the sale) ; see also Fox, Toehold Acquisitions, Potential Toehold Acquisitions and Section 7 of the Clayton Act, 42 Antitrust L.J. 573, 582 (1973). If necessary, any issues concerning the Omaha market can be further explored on remand.

part or all of the trade of the customer-party to the vertical arrangement." Despite MP's suggestions to the contrary, the merger between Cargill and MP is not even a true "product-extension merger," as the Federal Trade Commission characterized the proposed marriage of Procter & Gamble and Clorox, FTC v. Procter & Gamble Co., 386 U.S. 568, 577–578, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967). In that case, Procter's detergents and Clorox' bleach were so closely related that Procter could expect substantial competitive advantages of various sorts from adding Clorox to its product line. As the Commission pointed out, 63 F.T.C. 1465, 1544 (1963), quoted in FTC v. Procter & Gamble Co., *supra*, 386 U.S. at 573–574:

> Packaged detergents—Procter's most important product category—and household liquid bleach are used complementarily, not only in the washing of clothes and fabrics, but also in general household cleaning, since liquid bleach is a germicide and disinfectant as well as a whitener. From the consumer's viewpoint, then, packaged detergents and liquid bleach are closely related products. But the area of relatedness between products of Procter and of Clorox is wider. Household cleansing agents in general, like household liquid bleach, are low-cost, high-turnover household consumer goods marketed chiefly through grocery stores and presold to the consumer by the manufacturer through mass advertising and sales promotions. Since products of both parties to the merger are sold to the same customers, at the same stores, and by the same merchandising methods, the possibility arises of significant integration at both the marketing and distribution levels.

The relationship between Cargill's bulk commodities business and the cement industry bears only the most superficial resemblance to the product affinity between Procter and Clorox. The broad strokes with which MP attempts to characterize the similarities between cement manufacturing and salt mining, for example, fall far short of the mark. Salt and cement reach different purchasers; advertising is not a major factor in the bulk sales of either product; there is no complementary use of the two goods; and the possibility of integrated production or distribution is remote. MP presses most energetically its claim that Cargill's long experience with river barge transportation of bulk commodities will give it a substantial advantage in the cement trade. Apart from the fact that Cargill's present barges may not be appropriate for cement at all, this congruity between Cargill's experience and cement distribution methods is not nearly enough to convert cement and other bulk commodities into "related products" in the sense that the *Procter & Gamble* Court used the term.[11] Cargill's interest was simply in further diversification and in profitable use of its capital in a business where it considered that its general skills in handling bulk commodities might enable it to be more successful than an acquirer whose only asset was a deep pocket.

On these facts, it would be rather hard for the mind not initiated into the intricacies of antitrust law to see how the effect of Cargill's acquisition of control of MP "may be substantially to lessen competition, or to tend to create a monopoly," as forbidden by § 7 of the

---

11. Since MP already has a fleet of 34 river barges specially equipped for cement transportation, it is not clear that Cargill's barging facilities would be of substantial aid; in any event, barging would not be used in the St. Louis and Kansas City markets, where MP plants are located. The alleged similarities in marketing and production between cement and bulk commodities are not impressive.

Even though both salt and cement require mining facilities and are often sold in bulk lots to industrial users, these similarities are not the sort that would be likely to produce overwhelming competitive advantages through the joint operation of the two enterprises. Finally, salt production is an extremely small part of Cargill's business—about 9/10 of 1% in sales.

Clayton Act, even though some other form of entry by Cargill would be more beneficial to competition. The vices of an oligopolistic market lie in price and other agreements among the oligopolists, often impossible to prove,—or what amounts to nearly the same thing—their slothful acquiescence in a state of affairs beneficial to all. Acquisition of one of the oligopolists by a more efficient company intent on acquiring a larger market share will break the explicit or implicit agreement or the condition engendered by the sloth.[12] The danger is that the acquirer may be so powerful and so wicked as to create a threat that oligopoly will progress toward monopoly. But the very fact that oligopoly assumes a small number of relatively well-entrenched companies gives some assurance against this; under such conditions the threat of monopolization would not seem of real consequence in the absence of a showing of overwhelming competitive advantage not present here or evidence equally absent that the acquirer intends to engage in predatory tactics. While counsel for MP makes much of a reported comment by a Senior Vice President of Dundee Cement who feared that Cargill's size and aggressiveness would make it a bull in a china shop, this would seem to cut rather in Cargill's favor. Introducing a bull into a china shop is a good way to break through the comfortable vices of oligopoly.[13] The very fact that the markets were oligopolistic would make acquisition of one of the oligopolists by a

strong company with Cargill's business philosophy more likely to bring down prices and promote service than in a market where free competition had already done this. To be sure, it is possible that after acquiring MP, Cargill might become simply another slothful oligopolist but, if so, matters would not be significantly worse than now.

We are told, however, that what seem to be such homely truths are inconsistent with the doctrines of "potential competition" and "entrenchment." In pressing its potential competition argument, MP principally relies on five Supreme Court decisions; United States v. El Paso Natural Gas Co., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964); United States v. Penn-Olin Chemical Co., 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964), complaint dismissed on remand, 246 F.Supp. 917 (D.Del., 1965), aff'd by an equally divided Court, 389 U.S. 308, 88 S.Ct. 502, 19 L.Ed.2d 545 (1967); FTC v. Procter & Gamble Co., supra, 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967); Ford Motor Co. v. United States, 405 U.S. 562, 92 S.Ct. 1142, 31 L.Ed.2d 492 (1972); and United States v. Falstaff Brewing Corp., 410 U.S. 526, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973).[14] While MP insists that each of these decisions is favorable to its position, it relies most heavily on *Penn-Olin, Procter & Gamble* and *Falstaff*.

Although the Supreme Court in effect applied a concept of potential competition

---

12. As was noted in ABA, Antitrust Developments 68 (1968), a conglomerate merger is not necessarily anti-competitive, but may actually promote competition as, for example, "where the conglomerate enterprise displaces a stagnant or inefficient firm in an industry dominated by a few powerful firms." See also Note, 72 Mich.L.Rev. 837, 852 (1974).

13. The context in which the "china shop" comment was made lends support to the view that Cargill's entry might well be procompetitive. The head of the Salt Group reported that Dundee's representative "[f]elt if Cargill was getting into cement that he would offer his advice so our entry wasn't too disruptive. He said 'the cement industry is a china shop and with Cargill's size and aggressive-

ness I don't want the bull to do too much damage.'" The record affords no indication that Cargill had any interest in the proffered advice.

14. MP also relies heavily on Kennecott Copper Corp. v. FTC, 467 F.2d 67 (10 Cir. 1972), cert. denied, 416 U.S. 909, 94 S.Ct. 1617, 40 L.Ed.2d 114 (1974), the facts of which are closer to those here presented than any of the Supreme Court cases. However, that decision has been cogently criticized, 86 Harv. L.Rev. 772 (1973), and while we surely would not be prepared to say without further study of the facts that we disagree with it, we are equally unprepared to accept it as correctly interpreting § 7.

in the *El Paso Natural Gas* case, it was in *Penn-Olin* that the Court began to sketch the role that the doctrine would play in § 7 analysis.[15] The district court in *Penn-Olin* had found that both Pennsalt and Olin Mathieson were engaged in producing sodium chlorate or similar chemicals, and that expansion into sodium chlorate production in the Southeast United States would be a natural step for either company. However, the lower court found that the two companies would not *both* have entered the market independently. On the basis of that finding, it dismissed the complaint charging that the two companies had violated § 7 by forming a joint venture to market sodium chlorate in the Southeast. The Supreme Court reversed. Even if only one of the companies would have entered on its own, the Court held, there was a theory on which the Government could have prevailed, 378 U.S. at 173:

> There still remained for consideration the fact that Penn-Olin eliminated the potential competition of the corporation that might have remained at the edge of the market, continually threatening to enter. Just as a merger eliminates actual competition, this joint venture may well foreclose any prospect of competition between Olin

and Pennsalt in the relevant sodium chlorate market.

While the Court did not distinguish clearly betwen the present effect on competition of a company threatening to enter the market and the prospective effect on competition of a company that may enter the market in the future, see United States v. Falstaff Brewing Corp., 410 U.S. 526, 559–562, 93 S.Ct. 1096, 35 L.Ed. 2d 475 (1973) (Marshall, J., concurring), it plainly sanctioned the general applicability of the potential competition doctrine to § 7 cases.[16] However, beyond suggesting the broad parameters of the doctrine, *Penn-Olin* provides little comfort to MP. As we shall see, Cargill has no permanent commitment to the cement industry of the sort that both Pennsalt and Olin had to chemicals such as sodium chlorate. The "incentive to competition" that the *Penn-Olin* Court instructed the district court to look for was not shown in this case and could hardly be expected to flow from Cargill's relatively brief investigation of the cement industry. And while the *Penn-Olin* joint venture had strong overtones of both horizontal and vertical combination,[17] those elements are missing here.

The next case, *Procter & Gamble*,[18] is distinguishable on a number of grounds.

---

15. The *El Paso* case provides little guidance because the anticompetitive effect of El Paso's acquisition of its sole prospective competitor was so obvious that the Court was not pressed to explore the limits of the potential competition doctrine. Even though Pacific Northwest Pipeline was not technically a current competitor of El Paso in the California market, the Court noted that Pacific's threats to El Paso's hegemony there had already had demonstrable effects on the price of natural gas in California, 376 U.S. at 654–655. Where the prospective competitor has made a concerted effort to break a monopolist's hold on the market, the line between potential and actual competition loses much of its significance. "Unsuccessful bidders," the Court concluded, "are no less competitors than the successful one," 376 U.S. at 661.

16. In noting that the Pennsalt-Olin joint venture "may well foreclose any prospect of competition between Olin and Pennsalt," 378 U.S. at 173, the Court seemed to be primarily concerned about the future anti-competitive

effect of eliminating an actual potential entrant. In a later passage, however, the Court wrote, "[t]he existence of an aggressive, well equipped and well financed corporation engaged in the same or related lines of commerce waiting anxiously to enter an oligopolistic market would be a substantial incentive to competition which cannot be underestimated," 378 U.S. at 174, which seems to look to the present procompetitive effect of a potential entrant poised on the edge of the market.

17. The Court in *Penn-Olin* pointed out that Olin was a purchaser of sodium chlorate for internal consumption and that the process used in making sodium chlorate was "intimately related to other operations of Olin and required the same general knowledge." 378 U.S. at 166. Pennsalt had long been involved in the production of sodium chlorate in the West, and had marketed the product in the Southeast for several years.

18. For a perceptive analysis of the *Procter & Gamble* case and its implications, see

We have already adverted to one—the close relationship of packaged detergents, Procter & Gamble's most important product line, and household liquid bleach, in use and consequently in customers and methods of sale. This was significant in many ways. One was to discredit the assertion that Procter & Gamble would never have entered the bleach business on its own account.[19] A closely related one was that even if Procter would not so have entered, the nature of its business would make it appear a likely prospective entrant to the various liquid bleach producers.[20] The feasibility of combined advertising and sales effort[21] not only would assist Clorox in increasing its 48.8% share of the liquid bleach market (much higher than that in certain areas) but would discourage other entrants. Here there is no close similarity in products, customers, or marketing techniques, and nothing to show that acquisition of MP by Cargill would significantly raise the barriers to entry in the cement industry. Beyond this, there was evidence in *Procter & Gamble* that

after the acquisition Clorox had already demonstrated what would happen to a competitor seeking to increase its market share by stepping up promotion, 386 U.S. at 579 n. 3. Review of Mr. Justice Harlan's typically thoughtful concurring opinion, 386 U.S. at 581–604, further demonstrates the many differences between *Procter & Gamble* and this case.

In United States v. Falstaff Brewing Corp., *supra*, 410 U.S. 526, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973), the most recent "potential competition" case,[22] the Court, as in *Penn-Olin*, reversed and remanded for the district court to consider an alternate theory of liability. Falstaff, the fourth largest beer producer in the United States, was the only major producer that did not sell in New England. After some years of publicly expressing its desire to enter the Northeast market, it acquired Narrangansett, the largest seller of beer in the New England states. The district court had dismissed the Government's complaint on the basis of a finding, with which a majority of the Court did not quarrel,[23] that Falstaff's

Handler, Twentieth Annual Antitrust Review—1967, 53 Va.L.Rev. 1667 (1967).

19. Although Mr. Justice Harlan in his concurring opinion, 386 U.S. at 586, professed to think that the Court "certainly cannot mean to set its judgment on the facts against the concurrent findings [on this issue] below" by both the FTC and the Sixth Circuit, we are not so sure it did not do precisely that, and with much reason.

20. This is obviously not true here. There is no evidence that anyone in the cement business thought of Cargill as a potential entrant until Cargill publicized its interest in the spring of 1973, or that anyone will regard it as such a prospect if its acquisition efforts fail. Putting the matter another way, the nature of Procter's business was so close to the bleach industry that it was and would continue to be looked on as a likely potential entrant. The nature of Cargill's business is so different from the cement industry that it seems almost certain it had never been looked upon as a potential entrant and will no longer be if it is denied access in what it rationally considers to be the only feasible way. The judge's finding "that Cargill is just as likely an entrant into the cement industry as Procter was into liquid bleach," while correct enough if limited to the point that Cargill may have

wanted to enter the cement business as much as Procter & Gamble wanted to enter the liquid bleach business, is in clear error if meant to imply—and this is what is really significant—that Cargill would be viewed as remaining as likely a potential entrant as Procter even if its acquisition of a major cement producer was blocked.

21. Procter was the nation's leading advertiser, spending more than $80,000,000 a year on advertising and an additional $47,000,000 on sales promotion.

22. Ford Motor Co. v. United States, *supra*, 405 U.S. 562, 92 S.Ct. 1142, 31 L.Ed.2d 492, upon which MP relies, has little or no bearing here. The Court in that case approved a district court holding that Ford's acquisition of a substantial spark plug plant violated § 7. Since Ford was a primary consumer of spark plugs, the case presented a classic instance of vertical foreclosure. In addition, since Ford would continue to need spark plugs as long as it manufactured automobiles and trucks, it was clearly a potential *de novo* entrant into the industry. No such vertical foreclosure was even suggested to exist in this case.

23. This holding was in the portion of Mr. Justice White's opinion that was joined by Mr. Justice Douglas, giving it the support of four

management was unwilling to enter the New England market except by acquiring a substantial existing brewery. The Court reversed and remanded on the ground that it was an error of law to assume "that because Falstaff, as a matter of fact, would never have entered the market *de novo*, it could in no sense be considered a potential competitor"; it still might be a potential competitor "in the sense that it was so positioned on the edge of the market that it exerted beneficial influence on competitive conditions in that market," 410 U.S. at 532–533. The district court was therefore directed "to make the proper assessment of Falstaff as a potential competitor," taking this point into account, 410 U.S. at 537. The Court left "for another day the question of the applicability of § 7 to a merger that will leave competition in the marketplace exactly as it was, neither hurt nor helped, and that is challengeable under § 7 only on grounds that the company could, but did not, enter *de novo* or through 'toe-hold' acquisition and that there is less competition than there would have been had entry been in such a manner." 410 U.S. at 537.[24]

Although *Falstaff* is a hard decision to parse because of the number of opinions and abstentions,[25] the only addition it makes to *Procter & Gamble* is that in *Falstaff* the "edge of the market" factor stood more nearly alone. But the case was like *Procter & Gamble,* or perhaps even easier for the Government, in that the very nature of Falstaff's business would inevitably keep it on the edge of the market. Falstaff was the only one of the nation's largest beer producers which did not sell throughout the country. No matter how much it protested that it would not make a *de novo* or toehold entry into the Northeast, companies in the market might well not believe this; Falstaff would therefore remain a procompetitive force even if not allowed to enter the market in the way it wished.

■ We see no sufficient analogy between the positions of Procter and Gamble and Falstaff on the one hand, and Cargill on the other. Obviously Procter & Gamble had no intention of getting out of the detergent business or Falstaff out of the beer business and, so long as that continued, firms in the bleach or beer markets would fear their entry. But, as already indicated, there is no evidence that anyone in the cement business had dreamed of Cargill as a potential entrant until it sent out letters seeking information about the industry in March 1973. And there is no reason to believe that, if its current effort to enter the industry is frustrated, anyone in the cement business will regard it as a potential entrant in the future. The district court's error lay in identifying, for purposes of potential competition, a company making the same commodity (Falstaff) or a closely related one sold to the same purchasers by the same means (Procter & Gamble) with a diversifying company that had never before been regarded as a potential entrant and was not likely to remain one if its rational choice of a method of entry was barred.

The evidence against the feasibility of *de novo* entry by Cargill is overwhelming, and the district judge made no finding that this was an attractive possibility or that anyone inside or outside Cargill ever thought it was.[26] Whatever the

---

members of the Court of seven, see fn. 25, *infra.*

24. Because of this, the result was a remand rather than a reversal.

25. Mr. Justice White wrote for the Chief Justice, Mr. Justice Blackmun and himself. Mr. Justice Douglas joined in Part I of Mr. Justice White's opinion but would have preferred to reverse and direct judgment for the Government. Mr. Justice Marshall thought the finding of no intent to make a *de novo*

entry was based on inadequate exploration of the facts. Mr. Justice Rehnquist and Mr. Justice Stewart dissented. Mr. Justice Brennan and Mr. Justice Powell did not participate.

26. In footnote 15 of his opinion, the district judge referred to the fact that the district court in *Falstaff* "faced evidence that management had consistently rejected *de novo* or toehold entry," 410 U.S. at 530, but said "[t]here is no such evidence in the instant case." With respect to *de novo* entry, virtually all the

ultimate resolution of the differing views of Mr. Justice White and Mr. Justice Marshall on the weight to be given statements by management of the acquiring company, contrast 410 U.S. at 534–536 with *id.* at 563–570, here the objective evidence was wholly in accord with the views expressed by Cargill's management. An attempt to construct facilities similar to MP's, which Cargill hoped to acquire for $45,000,000, would cost up to $200,000,000. The difference in cost per annual barrel of capacity was that between $3–4 and $10–20. As against this and other objective facts cited by the Salt Group, to which we have referred above, the point that Cargill had made *de novo* entries into other businesses, where there was no showing of a similar cost disparity, is quite irrelevant.[27]

The judge did find, however, "that there is no evidence that Cargill would not enter the cement industry through some other company if it did not acquire Missouri Portland." This, of course, is not the same as saying there was evidence that it would. Apart from that, the statement affords no support to the decision if it includes producers with market shares substantially as large as MP's since an acquisition bad as regards MP would be equally bad as to them. Presumably therefore the judge was referring to "toe-hold" acquisitions, and to that we now turn.

The "toe-hold" notion is rather difficult to understand as applied to a capital intensive industry where objective facts rule out *de novo* entry and the proposed entrant has no interest in entering unless it can obtain a significant market share. The cost of converting a small plant into a big one would probably be as great as, or perhaps greater than, that of building a new one. Toe-hold

acquisition may therefore be meaningful in an industry like cement only if the new entrant could make a number of such acquisitions having capacity substantially equivalent to that of the larger company sought to be acquired.

■ Beyond this, we think MP completely failed to demonstrate that attractive toe-hold prospects were available in the relevant geographical markets. The plants cited as available means of entry into the defined markets are either already dominant in some other market, or owned by enormous national or international cement companies, or poor prospects for the future.

Judge Stewart found that Cargill had discussed the possibility of acquiring several other cement companies, including Valley, Alpha, American, Coplay and River. In addition, he noted that after initially being turned down by MP, Cargill recontacted Universal Atlas, Amcord, Dundee and River. None of these would qualify as toe-hold candidates. Alpha, River and Universal Atlas all have substantial shares of the St. Louis market; Dundee has a substantial share in both St. Louis and Chicago; Valley has seemingly insuperable technological problems;[28] and the Coplay and Amcord plants are too far from the four markets in question to have a realistic prospect of competing there.

In its reply brief in this court, MP pointed to Monarch, Arkansas Cement Corp., Texas Industries, and Gifford-Hill as possible toe-hold acquisition firms. Apart from the propriety of considering possibilities which were not specifically brought to the district court's attention, none of these seems to qualify. Monarch, it was pointed out in oral argument, is a land-locked plant in southeastern Kansas with only about 30 years of lime-

---

evidence was that way. At one point during the hearings, even MP's counsel conceded that Cargill "can't enter de novo."

27. So also is the fact that there has been *de novo* entrants into the cement business in the 1960's. We can take judicial notice how far construction costs have outpaced commodity prices since that time.

28. Even if Valley could compete actively in Memphis or St. Louis from its plant on the Yazoo River in Mississippi, Cargill had concluded that Valley suffers from poor quality limestone, limited reserves and river conditions that make barging on the Yazoo impossible in certain seasons.

stone reserves. The other three are located at some distance from the four markets in question and are almost certainly major participants in other markets.[29] MP's potential competition arguments thus are inadequate to support a finding of probable illegality.[30]

In addition to its potential competition claims, MP has advanced the "deep pocket" or "entrenchment" theory to support its claim that Cargill's acquisition would violate § 7. According to this theory, an acquisition by a firm with extraordinary resources might raise entry barriers in a particular industry by discouraging other potential entrants, or it might discourage competitive challenges from smaller rivals fearful of provoking the giant. Again, MP relies on the *Procter & Gamble* case for support. The Court there pointed out that Procter's acquisition of the dominant liquid bleach producer might render the smaller competitors "more cautious in competing due to their fear of retaliation by Procter," 386 U.S. at 578, and that Procter's advantages in advertising would give it a peculiarly powerful weapon with which "to meet the short-term threat of a new entrant," 386 U.S. at 579. In the cement industry, however, the "deep pocket" claim seems more metaphorical than real. Many of the companies in the business are controlled by economic giants already. Cement companies owned by U. S. Steel, the Swiss Holderbank group, Martin-Marietta and National Gypsum Corp. do not seem likely to cower before Cargill.[31] MP and smaller competitors have survived among these giant conglomerates in the past; it seems unlikely that MP will pose an insuperable new obstacle simply because of its acquisition by a wealthy stranger. Beyond this, the "entrenchment" theory seems to require more than simply a showing that the acquiring firm has a deep pocket.[32] The potential for en-

29. Texas Industries, with a terminal in Memphis, already competes in that market to a limited extent, apparently by shipping from its Artesia, Mississippi, plant. However, that company would not seem to be a likely toe-hold prospect at this point since its Mississippi plant has more than 40% of that state's production capacity and its Texas plant has about ⅓ of the production capacity in the Dallas-Ft. Worth area. Gifford-Hill poses much the same problem. The Arkansas Cement Co., with 10% of the Memphis market, is probably too substantial to be considered a true toe-hold candidate; in any event it appears to be a leading seller in Arkansas.

30. Cargill also argues with considerable force that, even if MP could show that there were reasonable toe-hold prospects, it would also have to show that Cargill was one of the most likely entrants, since otherwise its elimination as a potential entrant would not have an appreciable anti-competitive effect. MP's proof in this regard was not very impressive. Any cash-rich, diversifying corporation in a bulk, non-consumer industry might be equally attracted to cement. And though conclusions either way are speculative at this point, it would appear that other cement companies or ready-mix concrete companies would be at least as likely as Cargill to enter the relevant markets, particularly since present regional producers can ordinarily extend their sales range simply by installing distribution terminals in new marketing areas, see fn. 10, *supra*. This point also deserves further exploration on remand.

31. Professor Turner noted that the "deep pocket" theory loses force where there are rivals large enough to counterbalance the acquiring firm's size, which is certainly the case here, see Turner, *supra* note 1, at 1360. As pointed out in Note, 86 Harv.L.Rev. 772, 783 (1973), where small potential entrants would be intimidated by a large present market occupant, the addition of another large figure in the market would have little incremental effect. MP makes the further argument that the present occupants of the field, though large, are not as cash-rich as Cargill, and that it is Cargill's liquidity that would impress and discourage potential entrants. This theory, however, has too much speculation in it to provide a sound basis for decision at this point.

32. There is no *per se* proscription against large size in an acquiring firm, see Reynolds Metal Co. v. FTC, 114 U.S.App.D.C. 2, 309 F.2d 223, 230 (1962) (Burger, J.); Smith-Victor Corp. v. Sylvania Elec. Prods, Inc., 242 F.Supp. 315, 319–320 (N.D.Ill.1965), although in FTC cases the courts have been quite generous in accepting Commission findings that in particular circumstances the purchaser's "deep pocket" has an anticompetitive effect, see, e. g., Ekco Products Co. v. FTC, 347 F.2d 745 (7 Cir. 1965) (acquiring firm's financial resources used to maintain merged firm's monopoly position in its market); General

trenchment that troubled the Court in *Procter & Gamble* was not primarily a function of Procter's relative size, although the disparity between Procter and all of Clorox's competitors was enormous. The real danger of entrenchment came from the kinds of competitive advantages that affiliation with Procter could provide for Clorox, already the dominant firm in the liquid bleach market. As we have noted, Cargill would bring nothing to the cement industry comparable to Procter's huge advertising and merchandising programs, which could readily include bleaches as well as detergents.

In view of the weakness of the "entrenchment" claim, the lack of proof that Cargill exerted any "edge effect" on present competitive conditions, and the slim likelihood that Cargill would enter the markets here in question *de novo* or by toe-hold acquisition, we conclude that the plaintiff here was a long way from demonstrating the probability of success ordinarily required to warrant preliminary injunctive relief.[33]

## IV.

MP suggests that even if the foregoing analysis is sound, the district judge nevertheless acted properly in issuing the injunction under the second branch of the rule of this court recently recited in Sonesta International Hotels Corp. v. Wellington Associates, 483 F.2d 247, 250 (2 Cir. 1973):

> The settled rule is that a preliminary injunction should issue only upon a clear showing of either (1) probable success on the merits *and* possible irreparable injury, *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

It is worth noting at the outset that, despite the references to plaintiffs in private antitrust suits as "private Attorney Generals"[34] that have now become commonplace, MP is entitled to injunctive relief only "against threatened loss

---

Foods Corp. v. FTC, 386 F.2d 936 (3 Cir. 1967), cert. denied, 391 U.S. 919, 88 S.Ct. 1805, 20 L.Ed.2d 657 (1968) (product-extension merger in which General Foods' power in the household market would endanger the balanced duopoly in the steel wool soap pad market) ; United States Steel Corp. v. FTC, 426 F.2d 592 (6 Cir. 1970) (vertical integration ; U. S. Steel's connections in related industries and its financial power raised entry barriers) ; Kennecott Copper Co. v. FTC, *supra* (approving Commission finding that Kennecott would use "deep pocket" to acquire vast coal reserves and thus compete for long-term utility supply contracts). On the other hand in Stanley Works v. FTC, 469 F.2d 498, 520 (2 Cir. 1972), cert. denied, 412 U.S. 928, 93 S.Ct. 2750, 37 L.Ed.2d 155 (1973), Judge Mansfield, with the apparent support of the majority on this point, see *id.* at 501–502 n. 8, observed that even though Stanley's assets were more than three times as great as the largest cabinet hardware sales company in the country, the FTC had failed to prove *how* the merger had raised barriers to entry. The Commission had not shown that the merger had in any way affected initial start-up costs, that it had increased the need for product differentiation, or that it had increased the need for sales promotion and advertising. In that case, as in this one, mere reci-

tation of the "deep pocket" shibboleth was not enough.

33. Both parties have called our attention to a 1966 report on the cement industry by the staff of the FTC, entitled Economic Report on Mergers & Vertical Integration in the Cement Industry. While the report views the decreasing number of companies in the industry with some alarm, the fears are directed at acquisitions by companies already in the industry or in a downward vertical relationship. This seems to favor Cargill's contention that such companies rather than outsiders are viewed by the industry as the most likely potential entrants, see fn. 30, *supra*. MP answers by insisting that because the FTC has opposed mergers between ready-mix concrete companies and cement producers, ready-mix companies cannot be considered potential entrants. But whatever the objections to vertical mergers between concrete and cement firms, there would plainly be no valid antitrust objection to a ready-mix concrete company entering the cement market *de novo*, see Ford Motor Co. v. United States, *supra*, 405 U.S. at 567–568 (1972), quoting from the district court's opinion, 286 F.Supp. 407, 441 (E.D. Mich.1968), if this was feasible.

34. As is well known, the phrase was originated by Judge Frank in Associated Indus-

or damage by violation of the antitrust laws . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings," 15 U.S.C. § 26.

Here again the uninitiated would find it somewhat difficult to discern what "loss or damage" Cargill's tender offer could inflict on MP as a corporation, as distinguished from its management. A cornerstone of MP's antitrust argument is that acquisition of control by Cargill would make MP not too weak but too strong. It insists that the right way for Cargill to compete in the cement business in MP's territory is by direct entry or toe-hold acquisition, either of which presumably would take business away from MP rather than bring more to it. Examination of the decisions of this court in private antitrust suits developing and applying the second branch of the rule stated in *Sonesta* reveals how much weaker MP's case is than any in which that rule has previously been applied.

The *fons et origo* of the second branch of the rule, at least in this circuit, is Judge Frank's opinion in Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2 Cir. 1953). The findings of Judge Hincks in the district court, 114 F.Supp. 307 (D.Conn.1953), in the decision there affirmed, contrast sharply with those of the district judge here. Both Hamilton and Benrus were engaged in the business of selling jeweled watches, but the watches of Hamilton—essentially the "target" company—were superior in quality. Against this background, the court found, 114 F.Supp. at 314:

> The association of Benrus' name with Hamilton as a consequence of the publicity given to Benrus' purchases of Hamilton stock has already impaired Hamilton's competitive position in the market which it serves; it has impaired the effectiveness of Hamilton's vigorous new merchandising policy because of antagonism on the part of retail jewelers to Benrus' practices and reputation with respect to the fair trade principles of the industry and its merchandising policies; at least the record contains a prima facie showing to that effect.

The court further found:

> A director on Hamilton's board elected by Benrus would be in a position to obtain confidential information of value to Benrus as a competitor, the disclosure of which would be harmful to Hamilton and would materially impair its competitive position. In participating in the management, such a director would be subject to frequent conflicts of loyalties involving decisions dependent upon the exercise of his judgment faculties many of which would be of such a nature that it would be impossible to demonstrate the presence or extent of the Benrus influence if that had been a factor . . . The presence of such a director on the Hamilton board would create a situation in which Benrus would have power to discourage the vigor of competition by Hamilton and so to embarrass and impede Hamilton's management that it might well be driven to unwanted collaboration or to a merger as the least of two evils. Such a situation would constitute irreparable harm to Hamilton.

The *Hamilton-Benrus* principle was applied in American Crystal Sugar Co. v. Cuban-American Sugar Co., 259 F.2d 524 (2 Cir. 1958). Here again the two companies were direct competitors;

---

tries v. Ickes, 134 F.2d 694, 704 (2 Cir.), vacated as moot, 320 U.S. 707, 64 S.Ct. 74, 88 L.Ed. 414 (1943), with respect to attacks on government action, specifically the construction of the phrase "person aggrieved" in § 6(b) of the Bituminous Coal Act of 1937. Today the standing of the Associated Indus-

tries over which Judge Frank had to labor so hard would not require much discussion or the development of a new metaphor. Compare Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

American Crystal, the "target" company, was a United States beet sugar producer, while Cuban-American produced Cuban cane sugar. Judge Dawson's findings of irreparable injury, 152 F.Supp. 387, 393 (S.D.N.Y.1957), included the following:

Plaintiff is taking steps to increase the amount of business which it does in certain states in the River Territory. Disclosure of any such plans and any similar future plans to any representative of a competitor would be harmful to plaintiff; and it may be assumed that such disclosure would become inevitable if defendant succeeded in getting control of plaintiff or in obtaining representation on the board of directors of the plaintiff.

For over twenty years federal legislation has established a limit on the United States marketings of the domestic beet sugar industry and all other sugar suppliers in the United States. To overcome this restriction each supplier has attempted over the years to increase its quota. Similarly, a conflict has arisen between the domestic beet sugar industry and those having an interest in the Cuban sugar industry since any increase in the quota of the former must come in large part from the quota of the latter. The defendant is a member of the United States-Cuban Sugar Council which, acting in close cooperation with the Cuban government and Cuban sugar mill owners, represents the Cuban sugar viewpoint. Until recent years this Council was in sharp and active conflict with the interests of the domestic beet sugar companies with respect to amendments to the Sugar Act of 1948. If plaintiff came under control of the defendant it would tend to limit the effectiveness of the plaintiff in representing the views of the American beet sugar interests.

Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co., 476 F.2d 687 (2 Cir. 1973), is closer to the instant case since it involved a tender offer by a conglomerate which was not a direct competitor. However, Gulf & Western's president controlled a company that was a direct competitor of A & P, 476 F.2d at 690–691, and the atmosphere of horizontal integration hung heavily over the case despite Gulf & Western's attempt to dispel it. Moreover, apart from the fact that the court found "a probability of A & P's success on the merits on its claims of securities law violations," 476 F.2d at 697, whereas the district judge here correctly found the contrary with respect to MP's securities claims, the court stressed A & P's allegations of vertical market foreclosure, with the potential exclusion of suppliers of upwards of $100 million of goods per year, 476 F.2d at 691; to the extent that Gulf & Western would supplant these with affiliates selling at higher prices, the possibility of damage was real.[35]

The judge here did not find in so many words that the balance of hardships tipped "decidedly" toward MP—perhaps because he considered it had shown a probability of success. However, he did find "that harmful practical effects on Missouri Portland and its shareholders

---

35. It is of critical importance to note that in balancing the interests of the tender offeror, the target company, the target's shareholders and the public, the *Gulf & Western* court placed heavy emphasis on its finding that the proposed acquisition was probably unlawful. Gulf & Western's right to invest on behalf of its shareholders "can only be so where a *lawful* acquisition or investment is involved," the court wrote, and in that case it found that "the probability that the 'investment' is unlawful, as shown above, is sufficiently strong to call into serious question G&W's right to proceed with the tender offer," 476 F. 2d at 698. The public interest in barring the acquisition was also held to be a direct function of the strength of the plaintiff's antitrust and securities law claims, 476 F.2d at 698–699. Since we have found against MP's probability of success on its antitrust claim, the balance of the various interests is necessarily quite different from that struck in *Gulf & Western*. A recent note wittily entitled, The Courts and the Williams Act: Try a Little Tenderness, 48 N.Y.U.L.Rev. 991, 1009–10 (1973), points out this important distinction of *Gulf & Western*.

would result if the tender offer were allowed to proceed, whereas the termination has inconsequential effects as to Cargill."

The harmful effects found with respect to MP were as follows:

(1) "Serious disruption to Missouri Portland's personnel would result from having Cargill as a substantial owner pending the trial."

(2) "Long-range planning and hiring would be significantly impaired."

(3) "The returning of shares to the market and the unscrambling of the assets would present substantial difficulties and might well result in serious harm to Missouri Portland and its shareholders."

To these we should add a fourth, mentioned in the *Gulf & Western* case, the possibility that MP might sustain expense in defending or suffer damages from claims in actions under the antitrust laws, 476 F.2d at 698.

Most of these items are rather unimpressive as applied to this case. Apart from the fact that the two points in item (3) are internally inconsistent, difficulty in "unscrambling" the assets could readily be met by a temporary injunction against their being scrambled, *cf.* FTC v. PepsiCo., Inc., 477 F.2d 24 (2 Cir. 1973). It is highly unlikely that Cargill, if ultimately ordered to divest itself of its MP shares, would find no way to dispose of them other than to dump them on the market at great loss to itself; moreover, the risk of an uncoordinated divestiture effort might well be greater in Cargill's current minority position than it would be if Cargill acquired control. Finally, MP has already

made plans for a 40% expansion, in which Cargill apparently concurs; the record contains nothing specific about what interference in planning would occur. Here again it must be emphasized that, in contrast to a case where the acquirer is a competitor of the target company, Cargill would have no interest other than the promotion of MP's welfare.

■ The argument about disruption of the morale of personnel, which has become standard in take-over cases, has a peculiarly hollow ring in this one. A principal motive for Cargill's desire to enter the cement industry by acquiring an established company was its own lack of know-how and the difficulty of obtaining qualified people; there has been no hurling of pejorative epithets about MP's management and expression of the desire to move in another "team" such as were present with respect to A & P; see 476 F.2d at 696–697.[36] Furthermore MP's executives had taken extraordinary precautions to protect themselves. Within a few hours after learning of Cargill's impending offer, the chairman of MP had his board approve a seven-year employment contract at $118,000 a year;[37] earlier in December the chairman had signed contracts, similar except for amount, with all the other officers. Possible liability for the expense of or damages in antitrust litigation could be guarded against by an injunction requiring Cargill to indemnify MP for any such exposure pending a determination of legality or compliance with an order of divestiture.

■ Just as we believe the district court exaggerated the hardship to MP in allowing the tender offer to proceed, we think it minimized the hardship to

36. In taking into account the interests of A&P in preliminarily blocking Gulf & Western's tender offer, this court relied on a finding in the district court that "the executives of A&P have already suffered a tremendous downgrading of morale with just the suggestion that the company was about to be taken over by G&W." 476 F.2d at 698. We think district judges should take arguments of serious harm to a corporation due to jitters in executive suites with a fair amount of salt; the de-

moralizing effect, if any, would generally be limited to the fairly short period that tender offers usually run. In any event, no such finding was made here, and none would have been justified from the record.

37. The contract provided that if the chairman should leave the company because of a change in duties, a transfer out of the St. Louis area, or a reduction of compensation, his pay would nevertheless be unaffected.

Cargill in enjoining it. The court characterized this as merely "inconvenience and financial loss of what would amount to processing a new tender offer." Such a characterization might be apt if the claim were simply that Cargill had violated § 14(d) and (e) of the Securities Exchange Act, where needed correction could speedily be made. As was clear from the context, that was what we meant in saying "the application for a preliminary injunction is the time when relief can best be given," Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 947 (2 Cir. 1969). But the characterization is quite unrealistic when the temporary injunction will continue in force until the trial and decision of a complicated antitrust case before a busy district judge, with MP having the strongest motivation for foot-dragging. Cargill tells us that MP "has proposed a very extensive discovery procedure involving demands for literally tens of thousands of documents" and examination of a large number of Cargill witnesses, whereas MP "has not in almost four months turned over to Cargill a single sheet of paper to support the figures" concerning the four markets which were the cornerstone of the court's decision "despite numerous formal and informal requests to produce documents relating to market shares in any market" served by MP. Experience seems to demonstrate that just as the grant of a temporary injunction in a Government antitrust suit is likely to spell the doom of an agreed merger, the grant of a temporary injunction on antitrust

grounds at the behest of a target company spells the almost certain doom of a tender offer. See Target Company Defensive Tactics Under Section 7 of the Clayton Act, 4 Connecticut L.Rev. 352, 387–88 & n. 169 (1971).[38]

So far as the private interests are concerned, we therefore do not find the balance tipping "decidedly" or, indeed, at all, in MP's favor. Judge Hincks wrote in the opinion we approved in the Hamilton-Benrus case that "right thinking suggests a distinction between the private harm constituting the irreparable damage which is the primary concern of Section 16, and the lessening of competition in the relevant 'line of commerce' which constitutes the public harm with which Section 7 is primarily concerned," 114 F.Supp. at 317. With respect to public harm a target company must demonstrate a probability of success which, as previously held, MP did not do here.

Endeavoring to probe the intention of the framers of the Celler-Kefauver amendment to § 7 of the Clayton Act as best we can, we do not think they meant to endow incumbent management of a target company with the power to block free trade in its securities unless the anti-trust violation was fairly clear or the potential damage to the corporation decisively outweighed that to the would-be acquirer.[39] Under that test the injunction was wrongly issued.

### V.

Both MP and Cargill complain that the other committed violations of the Wil-

38. This was the result of the temporary injunction in the Gulf & Western case. As against the $20 per share offered by Gulf & Western, A&P shares are now selling at approximately $13 and have sold as low as $8.75, following the abandonment of the tender offer. While these prices doubtless reflect the general decline in stock prices, they show that management's success in forcing the abandonment of a tender offer is by no means an unmixed blessing for the shareholders of the target company. See also Allis-Chalmers Mfg. Co. v. White Consolidated Indus., Inc., 414 F. 2d 506, 510–511 n. (3 Cir. 1969), cert. denied,

396 U.S. 1009, 90 S.Ct. 567, 24 L.Ed.2d 501 (1970); Schneiderman, Preliminary Relief in Clayton Act Section 7 Cases, 42 Antitrust L.J. 587, 590, (1973); Note, 40 N.Y.U.L. Rev. 771, 772 n. 7 (1965).

39. In probing the legislative history of the 1950 amendment, Chief Justice Warren pointed to the final Senate report and other evidence indicating that the statutory words "may be substantially to lessen competition" required a showing of a reasonable probability of an anticompetitive effect, not a mere possibility, Brown Shoe Co. v. United States, supra, 370 U.S. at 323 & n. 39.

liams Act, 15 U.S.C. § 14(d), (e) and other securities laws in the course of publicizing and opposing the tender offer. Shortly after the announcement of its offer on December 19, 1973, Cargill placed advertisements in various newspapers describing the terms of the offer. Cargill promised to pay the $30 per share offer price as soon as practicable after tender but not prior to December 28, 1973. The letter of transmittal provided that Cargill was not to be required to purchase shares before the time of payment if there had occurred any of the three conditions listed in the margin.[40] Cargill announced that it intended to acquire control of MP and operate it as a subsidiary or, under certain conditions, to merge MP into Cargill.

MP responded with a letter of December 21 cautioning stockholders against hasty acceptance of Cargill's offer pending further word from management. In a subsequent letter dated December 26, MP advised its shareholders of a 25% stock dividend payable on January 15, 1974, to stockholders of record on January 7. The letter also announced the usual 40 cent dividend, payable on March 15, 1974, to stockholders of record on February 20, 1974.[41]

█ In its complaint, MP alleged that Cargill had committed seven independent securities law violations for misrepresentations and failures to disclose material information in its Offer to Purchase and the accompanying Form 13(d), which was submitted to the SEC.[42] The district court held that Cargill committed none of the alleged violations. On this appeal, MP presses only two of its securities law claims. These are that Cargill did not adequately disclose its future plans with respect to MP, and that Cargill did not disclose the possibility that its acquisition of MP would constitute an antitrust violation. We sustain the district judge.

After describing Cargill's plan to acquire control of, or possibly to merge MP, the offer stated:

> Except as described above, the Purchaser does not have any plan or proposal to liquidate Missouri, to sell its assets or to merge it with any other person, nor does the Purchaser at this time plan or propose any changes in the business of Missouri since the Purchaser wishes to review the situation in the light of circumstances prevailing if and when it acquires control of Missouri and at this time it reserves

---

40. The conditions, as set out in the Offer to Purchase, were as follows:

> *Certain Conditions of the Offer.* The Purchaser shall not be required to purchase or pay for any Shares tendered if, before the time of payment therefor, in the judgment of the Purchaser's management:
>
> (a) Missouri shall have issued or authorized the issuance of additional securities of any class or issued or authorized the issuance of other securities in respect of, in lieu of, or in substitution for the now outstanding Shares (except pursuant to a dividend or distribution required to be remitted to the Depositary pursuant to Section 6 of this Offer), or
>
> (b) Missouri or any of its subsidiaries shall have entered into an agreement or otherwise committed itself with respect to a merger, consolidation, acquisition of assets, disposition of assets, or other comparable event not in the ordinary course of business, or
>
> (c) there shall have been instituted or threatened any action or proceeding before any court or administrative agency, by any governmental agency or any other person,

challenging the acquisition by the Purchaser of the Shares or otherwise relating to this Offer, or otherwise materially adversely affecting Missouri or the Purchaser.

41. The letter went on to assail Cargill for offering a tender price substantially below the true value of the MP shares, to warn that shareholders who tendered now could be locked in from December 27 to February 17 by the terms of the offer, and to extol MP's prospects for growth and high profits.

42. These were: (1) Cargill had not sufficiently disclosed its financial condition; (2) it had offered to supply financial information privately to some MP stockholders; (3) it misrepresented that it did not intend to change the business; (4) it misrepresented to MP's management that it would not make a tender offer; (5) it failed to disclose the means of financing the tender offer; (6) it failed to disclose its own belief that MP shares were worth substantially more than $30; and (7) it failed to disclose that its acquisition of MP would violate § 7 of the Clayton Act.

the right to make such changes as it deems in the best interest of Missouri's business.

The regulations under § 14(d) require a tender offer to state or summarize the information required by Schedule 13D. Item 4 of Schedule 13D requires the prospective purchaser to:

> State the purpose or purposes of the purchase or proposed purchase of securities of the issuer. If the purpose or one of the purposes of the purchase or proposed purchase is to acquire control of the business of the issuer, describe any plans or proposals which the purchasers may have to liquidate the issuer, to sell its assets or to merge it with any other persons, or to make any other major change in its business or corporate structure, including, if the issuer is a registered closed-end investment company, any plans or proposals to make any changes in its investment policy for which a vote would be required by section 13 of the Investment Company Act of 1940.

"Change" is hardly an apt word to require disclosure of an intention to expand the acquired company or even to expand it substantially if conditions warrant. MP makes much of a letter from the head of the Salt Group to the cement consultant retained in February 1973 requesting the consultant to include in his study the development of a 20-year plan "which would ultimately lead Cargill to become the tenth largest cement company in ten years, the fifth largest in fifteen years, and largest in twenty years." But there is no evidence that any such plan was developed, much less adopted, or that the statement in the offer was anything but the truth. Until Cargill had decided how much it should seek to expand MP's business and by what method of financing,[43] it would be impracticable to give the stockholders any meaningful information. As said in Susquehanna Corp. v. Pan American Sulphur Co., 423 F.2d 1075, 1085–1086 (5 Cir. 1970):

> Though the offeror has an obligation fairly to disclose its plan in the event of a takeover, it is not required to make predictions of future behavior, however tentatively phrased, which may cause the offeree or the public investor to rely on them unjustifiably. . . . Target companies must not be provided the opportunity to use the future plans provisions as a tool for dilatory litigation.

See also Electronic Specialty Co. v. International Controls Corp., *supra,* 409 F.2d at 948; Note, The Courts and the Williams Act: Try a Little Tenderness, 48 N.Y.U.L.Rev. 991, 1001–02 (1973).

Relying on Gulf & Western Industries, *supra,* 476 F.2d at 697, and Elco Corp. v. Microdot Inc., 460 F.Supp. 741, 747–753 (D.Del.1973), MP next claims the tender was false and misleading in not disclosing the possibility or, as MP would have it, the probability that Cargill's tender offer would embroil MP in an antitrust law violation. Judge Stewart distinguished the cases in a passage we quote in the margin.[44] We agree with his analysis; indeed, we go further since we think that under the circumstances it would have been reasonable for Cargill's management to conclude that no antitrust obstacles actually existed.

---

43. MP's brief seems to proceed on the assumption that Cargill would simply donate capital to MP—an assumption surely contrary to fact unless Cargill acquired all of MP's stock or merged MP with itself, in which event MP's stockholders would no longer care.

44. "But the circumstances in both cases supported a conclusion that the position of the companies and the market conditions were such as to make the probability of antitrust violations clearly apparent at the time of the offer, and the Offer to Purchase should have included such a statement if any conscientious attempt had been made to state basic facts material to shareholders in reaching their decisions. Here, however, it would not have been unreasonable for Cargill's management to have concluded after appropriate inquiry that no substantial antitrust obstacles stood in the way of its acquisition. Therefore, under the circumstances before us, the possibility that the acquisition would result in antitrust violations, a possibility that exists with every merger, need not have been disclosed to Missouri Portland's shareholders."

Courts shoud tread lightly in imposing a duty of self-flagellation on offerors with respect to matters that are known as well, or almost as well, to the target company;[45] some issues concerning a contested tender offer can safely be left for the latter's riposte. Of course, if the FTC should issue a complaint with respect to Cargill's acquisition of MP, as we are told its staff has recommended, a renewed tender offer should disclose that fact, with whatever reasonable comments Cargill may choose to make about it.

## VI.

In its answer, dated January 2, 1974, Cargill counterclaimed for injunctive relief on the basis of eight alleged securities law violations committed by MP.[46] The district court rejected all but one of Cargill's claims, which is discussed in part VII, *infra*. Cargill here contends that the court erred in dismissing four of its claims of misrepresentations and omissions in MP's communications to stockholders.

 One of the omissions that Cargill protests is MP's failure to advise its stockholders about the employment contract with its chairman discussed above. While such a disclosure might have led some MP stockholders to question the selfless devotion to the stockholders' interest professed by management,[47]

we cannot believe it was sufficiently material to affect the tender decision. The other omission concerned MP's actions in purchasing its own securities. Although MP repeatedly told stockholders that its stock was worth more than the $30 per share which Cargill had offered, it had made this an upper limit in authorizing Smith Barney & Co. to purchase stock on the market to satisfy MP's obligations under management stock option plans. The judge properly rejected this claim. MP's price ceiling was in no way inconsistent with its insistence that the company's stock was worth substantially more than $30 per share. To the contrary, corporations purchase stock in the market (rather than issue new stock) for use in meeting stock option plans only when they regard the price as depressed.

 Cargill complained also that MP was guilty of misrepresentation when it cautioned shareholders that if they sold their shares or tendered them to Cargill during the term of the offer, they would lose the 25% stock distribution to shareholders of record on February 7, 1974. It argues that the value of the distribution lay in the declaration of the usual 40¢ dividend on the increased number of shares which, as a practical matter, was no different than a 25% increase in the dividend, and that the effect of this action would be reflected in appreciation of the market price,

45. It is also worth noting that here Cargill's offer was for all of MP's stock whereas Gulf & Western's was for only 15% of A&P's. It is hard to see the materiality of a possible antitrust violation to an MP stockholder who had tendered and been paid for all his stock.

46. These were: (1) MP had falsely represented that tendering stockholders would be "locked in" until February 17, 1974; (2) it had falsely represented that the stock distribution had increased the value of each shareholder's investment by 25% and that the distribution was made because of the company's improved financial performance rather than to deter Cargill's tender offer; (3) it had falsely stated that the intrinsic value of each share of MP stock was $138; (4) it violated § 10(b) of the Securities Exchange Act by purchasing shares of its own stock without disclosing various facts about its

financial condition and expansion plans; (5) it failed to disclose its alleged § 10(b) violations; (6) it violated § 14(e) of the Exchange Act by stating that the $30 offer price was too low, yet not disclosing that it had instructed that its own purchases not be made at a price above $30 per share; (7) it recommended rejection of the tender offer before filing a Schedule 14D form; (8) it breached a fiduciary duty to its stockholders by authorizing the stock dividend solely to preserve control by incumbent management.

47. We do not draw the favorable inference urged by MP from the fact that similar contracts had already been executed with its other officers. All these were executed after Cargill's initial approach to MP, although prior to its announcement that it would make a tender offer.

which indeed occurred after the announcement. However, MP's statement was literally true and here again we are not disposed to require parties to a tender fight to conform to standards of sterilization that might be appropriate in other contexts. See Electronic Specialty Co. v. International Controls Corp., *supra*, 409 F.2d at 948.

■ A further complaint concerns a warning by MP that tendering stockholders might be "locked in" until February 17. MP's statement was based on three provisions of the offer. One was that

Shares tendered may be withdrawn until 5:00 P.M. New York Time, on December 27, 1973, and unless theretofore purchased by the Purchaser, may also be withdrawn after February 17, 1974. Except as stated in this Section, tenders are irrevocable.

A second is paragraph 7 quoted in footnote 40 above. Cargill claims that these two provisions, which literally support MP's warning, were overridden by two sentences in paragraph 3 of the Offer to Purchase. One reads:

Payment for all Shares duly tendered and purchased pursuant to this Offer. for which certificates have been deposited with the Depository will be made by the Depository as promptly as practicable but not prior to December 28, 1973.

The other reads:

If any tendered shares are not purchased (see Sections 7 and 11 below), certificates for such Shares will be returned without expense to the tendering stockholder as promptly as practicable.

Cargill adds that in fact it paid for all tendered stock despite the occurrence of two of the conditions listed in Section 7. While Cargill may well be right in its reading that Section 7 simply gave it an option not to purchase but did not relieve it of the duty of prompt return, the wording was sufficiently confusing that we cannot fault the district court for refusing to find MP guilty of a violation; here

again, some weight should be given to the ease with which the opposing party could have set the matter straight. On a new offer, of course, Cargill can make all this entirely plain.

## VII.

■ The most serious battle over the alleged Williams Act violations concerns the one charge the district court did sustain. In a January 2 letter to stockholders and a January 3 advertisement in the Wall Street Journal, MP said:

This is Cargill's first bid. Cargill has indicated that it would like to acquire all of Missouri Portland's outstanding Common Stock. If Cargill does not get all of the Missouri Portland stock it seeks, you should ask yourself whether Cargill is likely to buy additional shares at a price higher than $30 per share—either in the open market or by raising its tender price. Cargill has reserved the right to do just this in its tender offer.

The court found this misleading since the offer provided and § 14(d)(7) required that the benefit of any improvement during the course of the offer should extend to tenderers whose stock had already been purchased. Because of this the district judge ordered that, in the event this court permitted renewal of Cargill's offer, MP should submit all defense material to him for advance approval. MP says that its reference was to a higher price in a new offer and that in any event the remedy is too severe.

The warning is certainly capable of the construction that an increase in price during the offer, or more likely, an extension since the offer was about to expire, would not inure to the benefit of those who had already tendered. As such it would be seriously misleading. How far the structures of § 14(d)(7) can be avoided by allowing an offer to expire and then making a better one is an issue as yet undecided. See Aranow & Einhorn, Tender Offers for Corporate

Control 135–37 (1973).[48] The court was thus fully warranted in finding a violation here. But we agree with MP that the remedy was too severe. An injunction against such a warning without apprising stockholders of the terms of the offer and the requirements of the statute concerning an improvement in price during the offer should suffice.

We therefore reverse the grant of a temporary injunction on the basis of the antitrust claims and remand for the framing of a temporary injunction which will allow a resumption of the offer pending final determination of the antitrust issues under terms and conditions consistent with Part III of this opinion. We reverse the injunction against MP on the basis of the warning as to an increase in price for reformulation of the conditions in accordance with Part VII of this opinion. We affirm the court's other dispositions of claims under the Securities Exchange Act. Cargill may recover three-quarters of its costs.

---

48. Probably much will depend upon the circumstances. If the first offer was a failure and the time gap short, a court would be likely to hold that the statute applied; *per* *contra* if the time gap was substantial and there had been a general increase in stock prices.