The ANACONDA COMPANY, Plaintiff,

v.

CRANE CO., Defendant.

CRANE CO., Plaintiff,

v.

The ANACONDA COMPANY, Defendant.

Nos. 75 Civ. 4400 IBW and 75 Civ. 4535 RO.

United States District Court, S. D. New York.

Nov. 17, 1975.

1212

Chadbourne, Parke, Whiteside & Wolff, Skadden, Arps, Slate, Meagher & Flom, New York City, for The Anaconda Co.; Edward C. McLean, Jr., Terry Thompson, William P. Frank, Christopher Gallagher, Jonathan J. Lerner, Mitchell M. Gitin, New York City, of counsel.

Lord, Day & Lord, New York City, for Crane Co.; John W. Castles 3rd, John J. Loflin, Paul R. Hundt, New York City, of counsel.

## OPINION AND ORDER

KEVIN THOMAS DUFFY, District Judge.

The captioned matters, hereby formally consolidated for all purposes, arise out of an offer by the Crane Co. (hereinafter "Crane") to exchange certain subordinated debentures to be issued by it for five million common shares of The Anaconda Company (hereinafter "Anaconda"). By such a transaction Crane would gain 22.6 per cent of the ownership of Anaconda, a somewhat dominant position since presently the largest stockholder of record in Anaconda has .05 per cent of the issued and outstanding common stock.

Both Anaconda and Crane now seek preliminary injunctions: Crane seeks to restrain Anaconda from alleged violations of Section 14 of the Securities Exchange Act of 1934 and Anaconda seeks to restrain Crane from alleged "omissions to state material facts" in its registration statement and prospectus covering the new subordinated debentures to be used in the exchange offer and from alleged violations of the antitrust laws.

Upon the application for a temporary restraining order both sides agreed be-

fore me to stop all publication of statements to the public concerning the proposed exchange offer until the decision of this Court on the applications for preliminary injunctions. This opinion is that decision and constitutes findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure.

## I. THE TEST TO BE APPLIED

█ In this Circuit two separate tests may be used in considering granting a preliminary injunction. The movant must demonstrate either "(1) probable success on the merits *and* possible irreparable injury, *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Missouri Portland Cement Co. v. Cargill, Inc.*, 498 F.2d 851, 866 (2d Cir.), *cert. denied*, 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974); *Sonesta International Hotels Corp. v. Wellington Associates*, 483 F.2d 247, 250 (2d Cir. 1973). See also *Gulf & Western Ind., Inc. v. Great Atlantic & Pacific Tea Co., Inc.*, 476 F.2d 687, 692 (2d Cir. 1973).

In the case at bar both sides argue that they are entitled to the preliminary injunction on the basis of the "balance of hardships" standard.

## II. THE CRANE CASE AGAINST ANACONDA

On August 7, 1975, Crane issued a press release publicly announcing that its Board of Directors had approved a proposed exchange offer for the five million shares of Anaconda stock. The press release indicated that for each share of Anaconda there would be an exchange of a $25 principal amount of Crane's 8% subordinated sinking fund debentures, due 1985, (the second amendment to the registration statement filed with the Securities and Exchange Commission (the "S.E.C.") reduced the face amount of the debentures to $20). The original press release provided that the exact terms of the exchange offer would be contained in a prospectus and registration statement to be filed with the S.E.C. and would not commence until the effective date of the registration statement (that registration statement has yet to become effective.)

## A. ANACONDA'S AUGUST 8 PRESS RELEASE

Apparently Crane's announcement took the management of Anaconda by surprise. On August 8, 1975, Anaconda issued a press release which states in pertinent part:

"When Crane does file a registration statement and preliminary prospectus with the S.E.C., Anaconda will be in a position to consider an evaluation of the situation. Until that time it should not be assumed that the Anaconda management is sympathetic to the proposed offer."

At the time this press release was issued no Schedule 14D statement had been filed with the S.E.C., as required by Section 14(d) of the Securities Exchange Act of 1934 (the "Act"), 15 U.S.C. 78n(d) and Rule 14d–4 promulgated thereunder.

Crane contends that this press release was in violation of Section 14(d) of the Act.

## B. ANACONDA'S AUGUST 14 LETTER AND PRESS RELEASE

On August 14, 1975, Anaconda filed the requisite Schedule 14d with the S.E.C. and issued a letter to its stockholders (the press release with the text of the letter which contained the following paragraph:

"Nor is there any assurance that an exchange offer will ever be made. * * * In this connection you should know that earlier this year Crane announced a proposed exchange offer for shares of another copper mining company. Crane never made the proposed offer, however, and after repeated delays finally disaffirmed its intention to do so. Some shareholders of that company may have traded in reliance on a proposed offer that did not materialize."

It is Crane's position that this paragraph was intentionally misleading, in violation of Section 14(e) of the Act, since the "proposed exchange offer" for shares of another copper mining company referred to was thwarted by the connivance of Anaconda.

## C. ANACONDA'S AUGUST 26 LETTER

Thereafter, on August 19, 1975, Crane filed its registration statement with the S.E.C. covering the new subordinated debentures proposed to be issued in exchange for Anaconda stock. On August 26, 1975, Anaconda mailed a second letter to its shareholders which said in relevant part:

"Your Board of Directors, after study and consultation with Lehman Brothers Incorporated and The First Boston Corporation, investment bankers, has concluded that the proposed exchange offer of Crane Co.'s Subordinated Debentures for five million shares of Anaconda Common Stock is not in the best interests of Anaconda and its shareholders."

It is Crane's contention that there could have been no dispassionate and impartial evaluation of this offer by the Anaconda Board since five of the ten directors of Anaconda are associated with certain banks which made substantial loans to Anaconda. These loans provide for full payment call at the option of the lenders whenever more than 10 per cent of the Anaconda voting stock was concentrated in one person or entity. This "omission to state" is claimed by plaintiff to be in violation of Section 14 of the Act.

## D. ANACONDA'S SEPTEMBER 18 LETTER

On September 18, Anaconda issued a letter to its shareholders which contained the following statement:

"You should also be aware that Crane's similar debt instruments sell at a significant discount and that if the subordinated debentures they propose to have you accept sell initially at a substantial discount, which our bankers advise us is likely, adverse tax consequences to the accepting debenture holders could result. This would be in addition to such adverse impact on shareholders as would result from the fact that the action itself would be a taxable transaction."

Crane complains that this letter at the least is misleading as to the potential tax aspects of the exchange offer since the alleged tax aspects depend upon the cost basis of the individual Anaconda holder. Thus according to the argument if the tendering Anaconda shareholder had a cost basis for his stock which was lower than the value of the Crane debentures, he would pay a tax on a difference, but if the cost was higher, the accepting shareholder would pay no tax and might even receive a benefit for a tax loss. Crane contends further that Anaconda was required to set forth the entire tax consequences in its letter to shareholders and that its failure to do so constituted a violation of Section 14(e) of the Act.

## E. DISCUSSION

■ It seems clear to me that the August 8 release by Anaconda comes within the provision of 17 C.F.R. § 240.14d–2(f) which provides in pertinent part that:

"(f) A communication from an issuer to its security holders which does no more than (1) identify a tender offer or request or invitation for tenders made by another person, (2) state that the management of the issuer is studying the matter and will, on or before a specified date (which shall be not later than 10 days prior to the date specified in the offer, request or invitation, as the last date on which tenders will be accepted, or such shorter period as the Commission may authorize) advise security holders as to the management's recommendation to accept or reject the offer, request or invitation, and (3) request security holders to defer making a determination as to whether or not they should accept or reject the offer, request or invitation until they have received the manage-

ment's recommendation with respect thereto."

This rule was intended to permit the management of a target company to respond immediately to an attempted corporate takeover. The statement issued by Anaconda is bland enough to fit within the meaning of this provision. Crane argues, however, that Anaconda's press release was really an attempt by Anaconda management to communicate the message that Anaconda would oppose the proposed offer and, as such, was a violation of Section 14(d) of the Act in that it constituted a "solicitation" or "recommendation." The only thing that Crane could otherwise request was that Anaconda's management should have included a statement that it was not necessarily opposed to the proposed offer. This type of requirement of the niceties of language is certainly not required in the real world and I find no violation in the August 8 release.

■ Nor can I find any violation as to the August 14 letter and press release, which refers to an earlier Crane "proposed exchange offer for shares of another copper mining company", which was thereafter disaffirmed. The facts are that Crane attempted to obtain control of Inspiration Consolidated Copper Company, a corporation in which Anaconda held 27.6 per cent of the common stock and was the largest stockholder thereof. Anaconda did not exercise control over Inspiration but agreed with the management of Inspiration and voted Anaconda's stock interest to permit the sale of a substantial block to the "Anglo-American group," thus precluding Crane's attempt to seize control. It is not uncommon for a private company to look for a friendly merger nor is it uncommon for stockholders to agree to such an arrangement. The facts concerning Crane's attempted takeover of Inspiration were well known in the financial community and could easily be ascertained by the average investor by re-reading any newspaper file or financial references on the activities of Crane. Moreover, Crane may explain any facts which it wishes the Anaconda shareholders to know in its prospectus. See *Missouri, Portland Cement Co. v. Cargill, Inc.*, 498 F.2d 851, 873 (2d Cir. 1974). As such Crane's contention that the August 14 letter was violative of the Act is frivolous.

■ Turning next to the August 26 letter in which the Anaconda Board of Directors flatly recommended rejection of Crane's bid for shares of Anaconda, I find that there is likewise no violation. I have reviewed the report of Anaconda's investment bankers and it is clear to me that a business man could make a proper business judgment based upon that report to recommend rejection of the Crane offer. To claim, as Crane does, at least inferentially, that five of the Directors on the Board were biased because of their affiliation with banks involved in a consortium of lenders to Anaconda, whose loans contained restrictive covenants when an outsider taking more than 10 per cent of the stock, is to ignore the underlying facts. The restrictive covenants were originally inserted in Anaconda's loans by an insurance company. The lead bank in the consortium is the Morgan Guaranty Company and none of the "bank directors" of Anaconda were affiliated in any way with Morgan Guaranty. None of the bank directors participated in the negotiations leading to the loan. The restrictive covenant could be waived by any one bank in the consortium. To impute bias on the basis of such a tenuous factual underpinning is further than this Court is willing to go. Compare *Missouri Portland Cement Co. v. Cargill, Inc.*, 498 F.2d 851, 873 (2d Cir.), *cert. denied*, 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974) with *Mills v. Electric Autolite Co.*, 403 F.2d 429 (7th Cir. 1968), rev'd on other grounds, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). To have Anaconda in its letter of August 26 highlight the restrictive covenants of its loan agreements would have done far greater damage to Crane's cause than the course followed by the Anaconda Board.

Crane's complaints about the September 18 letter from Anaconda are similarly without foundation. It was incumbent on Anaconda management to point out the possibility of the tax consequences flowing from the exchange offer. Clearly, Anaconda was in no position to analyze what those consequences would be for each and every one of its shareholders. To do so would be a monumental task for the Anaconda management would have had to have detailed knowledge of the personal financial situation of each of its shareholders and would have had to have tax counsel render individual advice to each one. Section 14 of the Act does not require that type of exercise. It was fair for the management of Anaconda to alert its shareholders to the possibility of an adverse tax impact so that each shareholder could go to his own financial adviser to ascertain what the consequences would be. It is not necessary that "parties to a tender fight . . . conform to standards of sterilization . . .." *Missouri Portland Cement Co. v. Cargill, Inc.*, 498 F.2d 851, 874 (2d Cir. 1974).

The fact that the debentures might be traded in the after market at a discount apparently is not now claimed by Crane to be a violation of the Act, particularly in view of the fact that the S.E.C. has required a highlighting of that fact, both in the registration statement and the proposed prospectus. The fact that the presently outstanding subordinated debentures of Crane are trading at a substantial discount was clearly reason enough for this requirement by the S.E.C.

Any other claims of violation of the proxy rules implied by Crane in its original argument are without merit and I totally reject them.

Since there does not appear to be either a "probability of success on the merits" or "serious questions" raised by Crane's original motion for a preliminary injunction it is hereby denied. Moreover, Crane, in support of its motion for a preliminary injunction, relies on the proposition that where past violations of the securities laws have occurred and there is a reasonable likelihood that the wrong will be repeated, injunctive relief is proper. See, e. g., *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1100 (2d Cir. 1972); *SEC v. Culpepper*, 270 F.2d 241 (2d Cir. 1959). However, not only am I unpersuaded at this stage of the proceedings that any violations of the law have occurred, but I am likewise unable to find such a reasonable likelihood of prospective violations as would justify an injunction in this case. Crane remains able to pursue redress of any past wrongs in its underlying cause of action.

Certain questions, however, arose after the hearing on the preliminary injunction which Crane contends were violations of Section 14(e). I permitted Crane to amend its complaint in this regard and I will rule on those allegations in Section IV, *infra*.

### III. ANACONDA'S CASE AGAINST CRANE

Anaconda's application for a preliminary injunction against Crane is posited on two separate basic allegations: (1) Crane in its registration statement made false and misleading statements of material facts and omitted to state material facts such as to render the statements made misleading in violation of the Securities Act of 1933, 15 U.S.C. § 77a *et seq.*, and the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*; and (2) the exchange offer would be violative of the Antitrust laws generally and the Clayton Act § 7, 15 U.S.C. § 18, in particular.

Both allegations are in large part based on the assumption that Crane by the exchange offer is seeking actual control of Anaconda.

At the hearing Anaconda sought to prove that such a control takeover would fall within the proscription of *Gulf & Western Indus., Inc. v. Great Atlantic & Pacific Tea Co., Inc., supra.* Anaconda attempted to prove both horizontal and vertical antitrust violations and potential reciprocal dealings between Crane and

its subsidiaries and Anaconda if controlled by Crane.

But three things have happened since the hearing in this case. First, Anaconda has acquired Walworth Co., a major competitor of Crane in the valve manufacture and assembly business, which set up a direct horizontal anti-competitive claim.

Second, Crane has submitted a "Stipulation" (which properly should be referred to as a "Consent Order",) whereby Crane will comply with an order that:

"1. Crane will not acquire more than Five Million (5,000,000) shares [22.6%] of the Common Stock of The Anaconda Company ("Anaconda") which Crane may purchase pursuant to its presently proposed Exchange Offer

. . ..

"2. So long as Crane owns any shares of stock of Anaconda, which Crane may acquire pursuant to its proposed exchange offer * * * it will not seek representation on the Board of Directors of Anaconda.

"3. So long as Crane shall own any shares of stock of Anaconda, it will comply with the provisions of Section 7 of the Clayton Act (15 U.S.C. § 18.)"

In this Consent Order, "Crane" is used to include any subsidiary or affiliate of Crane Co. in reasonably broad terms. At a hearing held before me on November 12, 1975, Crane amended the stipulation to include a prohibition against "voting to bring about or attempt to bring about a substantial lessening of competition in any line of commerce in any section of the United States.

Third, this Court turned over to the S.E.C. (both the Division of Corporate Finance and the Division of Enforcement) all of the pertinent testimony and documents filed in the public hearing herein. In this connection, it should be noted that since the first filing of the registration statement Crane has not distributed to the financial community copies of the registration statement nor has Crane distributed to the investing public, including shareholders of Anaconda, any "red herring" or preliminary prospectus. This may be due in part to the gentle suggestion of this Court. The S.E.C. has sent a number of letters of comment to Crane since the first filing of the registration statement and Crane in an attempt to comply with the S.E.C. suggestions has filed a first amended registration statement and a second amended registration statement. The amendments to the registration statement have in most part blunted Anaconda's original allegations of violations of the Securities Laws. In permitting the normal administrative review (albeit assisted by the discovery unearthed in this litigation), I have not avoided my own responsibilities nor abstained from the field, in deference to the S.E.C., for I have carefully reviewed the disclosures demanded and eventually forthcoming, and I believe that the claims of Securities Laws violations are without foundation.[1]

Illustrative of the claims by Anaconda that Crane has omitted to state material facts is the allegation not covered by the S.E.C. letters of comment that the prospectus to be issued on the exchange offer should contain the "ratings" of the Crane subordinated debentures (and indeed, perhaps a comparison between that rating and the rating of bonds of certain municipalities which have recently fallen into disfavor with the financial community.) Such "ratings" and comparisons are readily available to the average shareholder. To the best of my knowledge such a requirement has never before been imposed by the S.E.C. and I see no need to require it in these circumstances. The other Securities laws violations claimed by Anaconda are similarly without merit.

In the allegations concerning antitrust violations and particularly in light of its merger with Walworth, Anaconda now

---

1. It may be that further disclosure may be required by my action today, e. g., the consent order should be included in the registration statement and prospectus.

argues that Crane's acquisition of Anaconda stock would have a probability of lessening competition in those markets in which Crane and Walworth compete and thereby violate Section 7 of the Clayton Act, 15 U.S.C. § 18. Anaconda's proof indicates that Crane had a total of 7 per cent of the overall industrial valve market in 1974. Walworth is purported to have had a 6 per cent share of that market during the same time period. Anaconda assumes the relevant geographic market to be the entire United States. From these facts Anaconda concludes that a substantial holding of its stock by Crane would run afoul of the current standards under Section 7. *United States v. Von's Grocery*, 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966); *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); *Stanley Works v. F.T.C.*, 469 F.2d 498 (2d Cir.), *cert. denied*, 412 U.S. 928, 93 S.Ct. 2750, 37 L.Ed.2d 155 (1973).

Anaconda also argues but with substantially less vigor that apart from the Walworth merger, the facts reveal a number of potential horizontal and vertical problems under Section 7. Evidence defining the relevant geographic and product markets is so sparse as to these claims as to leave an almost total vacuum of proof.

Crane's primary defense to these charges is based upon an exemption contained within Section 7:

> "This section shall not apply to corporations purchasing such stock solely for investment and not using the same by voting or otherwise to bring about, or in attempting to bring about, the substantial lessening of competition."

Crane has stated to this Court throughout these proceedings that it has no intention of acquiring control of Anaconda now or in the future and that its sole purpose is to acquire Anaconda stock as an investment. Crane's registration statement in its present form clearly reflects these assertions.

The Consent Order submitted to this Court for its approval would prohibit Crane from gaining a majority position in Anaconda's stock, seeking representation on its Board of Directors, or otherwise violating Section 7 of the Clayton Act. Moreover, Crane in open court agreed to amend this stipulation to include a prohibition against Crane's voting any Anaconda shares so as to bring about a substantial lessening of competition. Mr. Evans, chief executive officer of Crane, testifying under oath in open court, has ratified and adopted the stipulation as amended.

Anaconda suggests that there are insufficient indications of Crane's intentions to hold the stock solely for investment purposes. I am persuaded on the record as it now stands, particularly by the testimony of Mr. Evans, the representations of counsel, and the contents of the stipulation that Crane intends to hold Anaconda stock solely as an investment and that it will not attempt to use the stock or any influence gained thereby to lessen competition between Crane and Anaconda. Likewise, the Consent Order is sufficiently broad to prohibit any unilateral actions by Crane as to its own business operations which may have the effect of lessening competition with Anaconda. Needless to say, any violation of this order would be punishable as contempt.

The issue nevertheless remains whether the "solely for investment" exemption is available in the circumstances of this case. The Supreme Court has considered the application of this proviso in *United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957). From 1917 to 1919, du Pont had acquired a 23 per cent interest in General Motors ("G.M."). The government alleged that du Pont's position as the leading supplier of fabrics and finishes to G.M. was achieved through its ownership of G.M. stock. In finding a violation of Section 7, the Court held:

> ". . . that any acquisition by one corporation of all or any part of the stock of another corporation, competitor or not, is within the reach of the section whenever the reasonable likelihood appears that the acquisition will

result in a restraint of commerce or in the creation of a monopoly of any line of commerce." 353 U.S. at 592, 77 S.Ct. at 877, 1 L.Ed.2d at 1066.

Although du Pont argued that the G.M. stock acquisition was "solely for investment," the Court found to the contrary. The annual reports to the shareholders in 1917 and 1918 indicated that one of the features of the G.M. acquisition was that G.M. was a major customer of du Pont. The former sales manager and vice-president of du Pont became vice-president in charge of the operations committee at G.M. Steps were taken to insure that G.M. divisions were buying their supplies from du Pont. By 1921, G.M. and du Pont had the same Chairman of the Board. None of these factors are present in the Crane acquisition. All of the evidence presented thus far supports Crane's claim of investment intent.

The Court in *du Pont* left open the door to the future viability of the "solely for investment" statutory exemption but cautioned against use of the investor status to lessen competition:

"when the purchase is solely for investment, the plain language of § 7 contemplates an action at any time the stock is used to bring about, or attempting to bring about, the substantial lessening of competition." 353 U.S. at 597–98, 77 S.Ct. at 879, 1 L.Ed.2d at 1069.

■ In cases where the "solely for investment" exemption does not apply, a plaintiff need only show a reasonable probability of a lessening of competition. 353 U.S. at 589, 77 S.Ct. at 875, 1 L.Ed.2d at 1069. This standard is derived from language of the statute which condemns acquisitions "where the effect . . . may be" the lessening of competition. Thus, the anti-competitive effects may be attacked in their incipiency. The statutory exemption, however, conspicuously omits this language. Once it is established to the satisfaction of the Court that the acquisition is "solely for investment," the statute requires a showing that the defendant is "using the

[stock] by voting or otherwise to bring about, or in attempting to bring about, the substantial lessening of competition . . . ." No evidence has been presented to that effect and I am persuaded at this point that in light of the Consent Order the stock will not be used for such purposes.

■ It may well develop at trial that Crane has noninvestment motives not known to this Court or that Crane is attempting to use its shares to lessen competition. But as the proof has developed thus far, Anaconda has failed to make out its Section 7 claim. I find that at this stage there is neither a probability of success nor serious questions going to the merits sufficient to warrant the granting of a preliminary injunction. *Missouri Portland Cement Co. v. Cargill, Inc.*, 498 F.2d 851 (2d Cir. 1974).

The distinctions between the facts of this case and that presented to the Court in *Gulf & Western Ind., Inc. v. Great Atlantic & Pacific Tea Co., Inc., supra*, are too numerous to mention. Suffice it to say that the case presently at bar does not present the egregious situation that the Court found in the *Gulf & Western* case.

## IV. CRANE'S ALLEGATIONS OF 14(e) VIOLATIONS AFTER THE FIRST HEARING

As I have already noted after the completion of the first hearing herein, Anaconda acquired the Walworth Co. Just before that acquisition of Walworth, Crane attempted to obtain a temporary restraining order to stop Anaconda from consummation of the transaction. At the time I denied the temporary relief sought in a memorandum dated October 29, 1975. In that memorandum I suggested that to prove such a violation Crane would have the burden of proof "to show that the *sole* reason for acquisition is [was] an attempt to violate the section." Crane has suggested at the argument and hearing on the claimed new violation that it would be sufficient if the proof showe⁴ that the acquisition was made with the "central", "primary",

**1220**

"principal", or "dominant" purpose of preventing the shareholders of Anaconda from exercising their rights under the proposed exchange offer.

The only evidence produced in connection with this claim were the depositions of Mr. Place, Chairman of Anaconda, Mr. Granville, a director of Anaconda, and the testimony of Mr. Evans, Chairman of Crane. No matter which test is used it is clear to me that the facts are totally inconclusive.

Rather than going through a recitation of the testimony produced at the hearing which hopefully would be fully developed at trial, it is necessary only to look to the "irreparable harm" or "balance of hardships" required for the issuance of a preliminary injunction. Unlike the *Gulf & Western* case, *supra*, here it will not be "impossible to unravel the situation" after a full trial. 356 F.Supp. at 1074. In acquiring the Walworth Co., Anaconda set up a separate subsidiary to absorb Walworth. There apparently will be no integration of operations of the separate subsidiary and the parent except for purposes of a consolidated financial statement. Anaconda has retained Walworth's prior management and it is my understanding that everything will remain in place at least until the full trial of the issues herein.

Crane claims, however, that it will be injured because "tenders may well be deterred by the uncertain prospects created by" the acquisition of Walworth. (Affidavit of Martin J. Whitman, p. 3). Such a claim is tenuous at best and cannot serve to supply the "hardship" envisioned by the tests for granting a preliminary injunction. Accordingly, the preliminary injunction is denied.

Anaconda also requested, at the hearing permission to file an amended complaint. Such leave is granted so that all of the issues may be properly before the Court at the trial of this action.

IT IS SO ORDERED.